AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

Information Associated with Chronic Pain Resource That Is Stored At Premises Controlled by Practice Fusion, 731 Market St., Ste 400, San Francisco, CA 94103

Case No. 2:21-mj-545

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A.

located in the ___ **Northern** ___ District of ___ **California** ___ , there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1347 | Health Care Fraud |
| 21 U.S.C. 841 | Illegal Drug Distribution |
| 18 U.S.C. 1035 | False Statements in Health Care Matters |

The application is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of ___ days (give exact ending date if more than 30 days: ___ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Ryan Houston, Special Agent- HHS-OIG
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 8-16-21

City and state: Columbus, Ohio

*Judge's signature*

Chelsey M. Vascura, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

This warrant applies to information associated with Chronic Pain Resources, LLC (CPR) that is stored at premises owned, maintained, controlled, or operated by Practice Fusion, a company headquartered at 731 Market Street, Suite 400, San Francisco, CA  94103.

## **ATTACHMENT B – Items to be Seized**

I.      **Information to be disclosed by Practice Fusion (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including electronic health records, files, schedules, logs, billing documentation, or information that has been deleted but is still available to the Provider, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A for the time period January 1, 2017 through the present:

   a.  The complete electronic health record for all records associated with the account including information on authorship associated with the record, and the date and time at which each record was created and edited.

   b.  All records or other information regarding the identification of the account users; such as full user name, user identification, access logs, and audit logs.

   c.  The types of services utilized and service agreements.

   d.  All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

   e.  All records pertaining to the electronic scheduling of the individuals associated with the Provider, to include such information as; daily schedules (patient appointments) for each CPR provider, access logs identifying who created the schedules, audit logs associated with any edits or alterations to the schedules, and any other information/documentation pertaining to the creation and/or editing of the schedules.

    f.   All records pertaining to prescriptions issued by the Provider, to include; scanned copies of prescriptions, electronically generated prescriptions, dates the prescriptions were written/entered, and the name of the provider issuing the prescription.

    g.   Data of claims and billing related to the account, including electronic transmission of patient billing, superbills, procedure/diagnosis codes, patient information, schedules, other relevant medical billing data, CMS 1500 or UB04 forms, charges, payments, all claim images, and attachments stored in the Provider's EMR system.

## II.    Information to be seized by the government

All information described above in Section I that constitutes evidence and instrumentalities of violations of 18 U.S.C. § 1035 (False Statements Relating to Health Care Matters), 18 U.S.C. § 1347 (Health Care Fraud), and 21 U.S.C. § 841(a)(1) (Distribution of Controlled Substances), that involve Chronic Pain Resources, LLC (CPR), Dr. Gulam Mukhdomi (Gulam), Dr. Abida Makhdumi (Abida), and employees of CPR, known and unknown, occurring between January 1, 2017 and the present, including, but not limited to, for each account or identifier listed in Attachment A, information pertaining to the following matters:

    a.    Electronic health records of CPR.

    b.    Billing records of claims submitted by CPR.

    c.    Scheduling records of CPR.

    d.    Prescriptions generated/written by CPR providers/employees.

    e.    Correspondence with CPR providers/employees.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH CHRONIC PAIN RESOURCES, LLC THAT IS STORED AT PREMISES CONTROLLED BY PRACTICE FUSION, 731 MARKET ST., SUITE 400, SAN FRANCISCO, CA 94103 | Case No. _____<br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Ryan Houston, Special Agent with the United States Department of Health & Human Services, Office of Inspector General, Office of Investigations (HHS-OIG-OI), being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain account that is stored at premises owned, maintained, controlled, or operated by Practice Fusion, a cloud-based electronic health records (EHR) provider headquartered at 731 Market St., San Francisco, CA 94103. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Practice Fusion to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

2.      I am a Special Agent employed by the United States Department of Health and Human Services (HHS), Office of Inspector General (OIG), Office of Investigations (OI). I have

been so employed since January 2011. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510 (7) of Title 18, United States Code, in that I am empowered by law to conduct investigations and to make arrests for federal felony offenses.

3.     As part of my duties I am authorized to conduct investigations, audits and inspections in connection with the administration and enforcement of laws, regulations, orders, contracts and programs in which the U.S. Department of Health and Human Services (HHS) is, or may be, a party of interest, and perform other duties on behalf of the Secretary of the Department of Health and Human Services. My chief responsibility is the investigation of fraud involving Federal Health Care Programs. As a Special Agent with the HHS-OIG-OI, I have received basic criminal investigator training as well as specialized training in the investigation of fraud and financial crime. Previously, I was employed as a Special Agent with the Ohio Attorney General's Office, Medicaid Fraud Control Unit (MFCU) for seven (7) years. My primary responsibility during this seventeen (17) year period has been the investigation of criminal fraud against the health care programs commonly known as Medicare and Medicaid.

4.     The information contained in this affidavit is either personally known to me, based upon my interviews of various witnesses and the review of various records and publicly available information, or has been relayed to me by other agents or other sworn law enforcement personnel.

5.     Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to support the requested search warrant.

2

6.      Based upon my training and experience and the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1035 (False Statements Relating to Health Care Matters), 18 U.S.C. § 1347 (Health Care Fraud), and 21 U.S.C. § 841 (Illegal Drug Distribution) have been committed by individuals operating Chronic Pain Resources, LLC (CPR), a pain management clinic, located in the Southern District of Ohio.  There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## STATUTORY VIOLATIONS

7.      Based upon the information set forth below, I have reason to believe and do believe that certain evidence supporting violations of the following federal criminal statutes by CPR is presently being maintained or stored by Practice Fusion.

8.      18 U.S.C. § 1035 prohibits a person from knowingly and willfully falsifying, concealing, or covering up by trick, scheme or device a material fact in connection with the delivery of or payment for health care benefits, items, or services involving a "health care benefit program" as that term is defined in 18 U.S.C. § 24(b).  Similarly, section 1035 makes it illegal for a person to knowingly and willfully make a materially false, fictitious or fraudulent statement or use a writing or document knowing that it contains a materially false, fictitious or fraudulent statement in connection with the delivery of or payment for health care benefits, items, or services involving a "health care benefit program" as that term is defined in 18 U.S.C. § 24(b).  Both violations carry a maximum prison sentence of five years imprisonment.

9.      18 U.S.C. § 1347 prohibits, in connection with the delivery of or payment for health care benefits, items, or services, a person from knowingly and willfully executing or attempting to execute a scheme to defraud any "health care benefit program" as that term is defined in 18 U.S.C. § 24(b), or obtaining by false or fraudulent pretenses, statements, or promises, any money or property under the care, custody, or control of any "health care benefit program" as that term is defined in 18 U.S.C. § 24(b). Such is a violation of 18 U.S.C. § 1347 and carries a maximum term of imprisonment of ten years. This activity is a Specified Unlawful Activity as defined under 18 U.S.C. §1961.

10.      21 U.S.C. § 841 prohibits any person from knowingly or intentionally manufacturing, distributing, or dispensing, or possessing with intent to manufacture, distribute, or dispense, a controlled substance. Furthermore, in the instance when a licensed medical provider is involved, a prescription for a controlled substance must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his/her professional practice.

**<u>Medical Benefit Programs</u>**

11.      CPR has provided medical services to recipients of Medicare, Medicaid, and other healthcare benefit programs as that term is defined in Section 24(b) of Title 18, United States Code.

12.      Section 24(b) of Title 18, United States Code, defines a "healthcare benefit program" as "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract."

13.      Specifically, Medicare is a federal healthcare program that provides basic medical coverage for persons age 65 and over who are entitled to Social Security Benefits and for persons

4

under age 65 who suffer from certain disabilities. Medicare is administered by the Centers for Medicare and Medicaid Services (CMS), an agency of the United States Department of Health and Human Services (HHS). Individuals who received benefits under Medicare are often referred to as Medicare "beneficiaries."

14.     Medicare is comprised of four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D). Medicare Part B helps pay the cost of physician services, medical equipment and supplies, and other health services and supplies not paid by Part A.

15.     Prior to participation in the Medicare Provider Program and receipt of a provider number, a provider signs an agreement with the United States. Upon acceptance into the Program, the provider agrees to submit to certain regulations issued by the United States.

16.     Upon receipt of a Provider Number, the provider can submit claims directly to Medicare. As part of the provider agreement, the provider agrees to accept the terms and regulations issued by Medicare and the United States. Providers attest to their responsibility to comply with Federal and Medicare laws and regulations on a recurring basis.

17.     Medicare reimbursement requests for professional services, such as those from a physician for medical services, are made on a Health Insurance Claim Form (Form HCFA 1500). Each claim form submitted for reimbursement requires the diagnosis, date of service, procedure code, type of services provided, charges, name of and provider number for the entity providing the services, and a designation of the selected method of reimbursement. These forms require the provider to certify that the services on the form were "medically indicated and necessary for the health of the patient" and that the claimed services are true and accurate. The form further warns that any false claim, documents, or concealing of a material fact may be prosecuted.

5

18. Providers are required to keep patients' written medical records accurately and truthfully. According to the CMS rules governing health care providers, records must be kept at least six years. These written medical records serve as documentary support for the claim forms submitted by a provider to the programs and can be used to review the claims.

19. Medicaid is a federal health care benefit program designed to provide medical services, equipment, and supplies to certain individuals and families with low income pursuant to the Social Security Act (Title 42, United States Code, Section 1396, et seq.). Medicaid is a health care benefit program as defined in 18 U.S.C. § 24(b). Approximately 60% of the funding for the Ohio Medicaid program is supplied by HHS. The Ohio Medicaid program is administered by the State of Ohio, through the Ohio Department of Medicaid (ODM).

20. As part of the federally approved state plan, ODM has elected to contract with Medicaid Managed Care Organizations (MCOs) through contracts known as Contractor Risk Agreements (CRAs), which must conform to the requirements of 42 U.S.C. §§1395mm and §1396b(m), along with any related federal rules and regulations. 42 U.S. Code § 1396u-2. MCOs are health insurance companies that provide coordinated health care to Medicaid recipients. The MCOs contract directly with healthcare providers, including hospitals, doctors, and other health care providers to coordinate care and provide the health care services for Medicaid recipients. Providers who contract with an MCO, are known as Participating Providers. These providers likewise must enter into a "provider agreement" with the MCO in which the Participating Provider agrees to comply with all applicable state and federal statutes, regulations and guidelines. Participating Providers are assigned a unique provider identification number, which is necessary to be eligible to bill and receive reimbursement for services rendered to Medicaid recipients. As part of the Ohio Medicaid Program, Medicaid MCOs and the Participating Providers must furnish

medical and health-related services pursuant to the state plan. Pursuant to the CRAs, ODM distributes the combined state and federal Medicaid funding to the MCOs, which then pay Participating Providers for treatment of Medicaid recipients. As the administrator of the Ohio Medicaid Program, ODM must track all services received by recipients, whether enrolled directly with ODM or enrolled with a MCO. Therefore, Medicaid MCOs are required to submit to ODM encounter data, which includes detailed records of the services a Medicaid recipient received from a Participating Provider.

21. ODM pays Medicaid claims submitted to it by valid Medicaid providers.

22. A participating Medicaid provider is a person or business who agrees to (1) provide the service, (2) submit the claim, and (3) accept as payment in full the amount paid by the Ohio Medicaid program. The provider signs a Medicaid participation agreement, which requires them to keep records necessary to fully disclose the services provided to Medicaid patients. To receive Medicaid reimbursement for covered services, the provider electronically submits billing data to ODM, which pays the provider either by mail or electronic transfer.

23. Medicaid pays participating health care providers on the basis of reasonable charges for covered services provided to beneficiaries. They assign to each provider a unique billing Provider Identification Number (PIN). Providers agree to know Medicaid reimbursement policies, which are communicated via regulations, manuals and newsletters.

24. Medicaid providers agree to bill only for services actually rendered that are medically necessary to diagnose and treat illness or injury and for which the provider maintains adequate documentation. Medicaid currently requires health care providers to retain records of services for six (6) years from the date of payment for such services.

7

25. Pursuant to Ohio Administrative Code Sections 5160-1-01(a) and (b), medical

necessity is defined as: "procedures, items, or services that prevent, diagnose, evaluate, correct,

ameliorate, or treat an adverse health condition such as an illness, injury, disease or its symptoms,

emotional or behavioral dysfunction, intellectual deficit, cognitive impairment, or developmental

disability…." Further, "[c]onditions of medical necessity are met if all the following apply:

> (1) Meets generally accepted standards of medical practice;
> (2) Clinically appropriate in its type, frequency, extent, duration, and delivery setting;
> (3) Appropriate to the adverse health condition for which it is provided and is expected to produce the desired outcome;
> (4) Is the lowest cost alternative that effectively addresses and treats the medical problem;
> (5) Provides unique, essential, and appropriate information if it is used for diagnostic purposes; and
> (6) Not provided primarily for the economic benefit of the provider nor for the convenience of the provider or anyone else other than the recipient."
> O.A.C. §5160-1-01(c).

26. Submission of a claim to a healthcare benefit program, whether public or private,

involves representations by the provider that the services rendered were of a quality that met

professionally recognized standards which include: (1) informed consent; (2) were medically

necessary; and (3) were supported by documentation of such necessity.

**PROBABLE CAUSE**

27. CPR is a pain management medical practice located in the Southern District of

Ohio.

28. According to Ohio Secretary of State records, the Initial Articles of Incorporation

for CPR were filed on 9/29/2008, which listed Taif Mukhdomi as the registered agent for the

business.

29. According to CPR's website (www.cproh.com), CPR is operated by Dr. Gulam

Mukhdomi (GULAM) and Dr. Abida Makhdumi (ABIDA).

8

30.     GULAM obtained a license to practice medicine in the State of Ohio on or about 8/12/2003. To date, GULAM is still actively licensed to practice medicine in the State of Ohio.

31.     ABIDA obtained a license to practice medicine in the State of Ohio on or about 12/1/2003. To date, ABIDA is still actively licensed to practice medicine in the State of Ohio.

32.     A review of Medicare provider enrollment documents shows GULAM opened CPR on 10/1/2008 at 9000 N. Main St., Dayton, Ohio. Medicare documents list GULAM as the sole owner and president of CPR.

33.     Furthermore, Medicare provider enrollment records reflect CPR moved to 855 S. Wall St., Columbus, Ohio effective 11/1/2013. In addition, Medicare records reflect that effective 1/1/2014, CPR added a practice location at 4215 Gantz Rd., Grove City, Ohio.

34.     Medicare records also show ABIDA re-assigned her benefits to CPR effective 6/1/2010.

### Medicare Billing

35.     As part of our analysis and investigation, I am aware of CPR's billing practices to Medicare.

36.     From 1/1/2017 through 12/4/2020, CPR directly billed Medicare Part B for approximately $3.5 million and received payment of approximately $1.1 million for services allegedly rendered.

37.     The top procedure codes billed by CPR were:

- 99213 (Established patient office or other outpatient visit, typically 15 minutes)
  - Approximately $1.1 million billed; Approximately $341,000 paid
- 64483 (Injections of anesthetic and/or steroid drug into lower or sacral spine nerve)

9

- Approximately $309,000 billed; Approximately $99,000 paid

- 64635 (Destruction of lower or sacral spinal facet joint nerves using imaging guidance)

  - Approximately $266,000 billed; Approximately $82,000 paid

38.    According to Medicare Part B billing records, CPR also began billing for procedure code G0481 (Drug Test, Definitive) for dates of service on and after 10/26/2020.

- Specifically, for dates of service 10/26/2020 through 11/16/2020, CPR billed 60 claims of G0481 totaling $15,000, resulting in $8,612.45 in payments from Medicare.

### Ohio Medicaid Billing

39.    In addition, as part of our analysis and investigation, I am aware of CPR's billing practices to Ohio Medicaid for certain billing codes.

40.    According to Ohio Medicaid claims data, from 3/2/2015 through 4/7/2021, CPR billed Ohio Medicaid approximately $17.6 million and received approximately $4 million in payments for services allegedly rendered.

41.    The top procedure codes billed by CPR to Ohio Medicaid were:

- 99213 (Established Patient Office/ Outpatient Visit)

  - Approximately $7.8 million billed; Approximately $1.9 million paid

- 99204 (New Patient Office/Outpatient Visit)

  - Approximately $1.3 million billed; Approximately $304,000 paid

- 80307 (Drug Test Presumptive)

  - Approximately $472,000 billed; Approximately $214,000 paid

10

## Investigation

42.      On July 28, 2020, the Ohio Board of Pharmacy received a complaint regarding CPR. The complainant, who is a medical professional at a nearby area business, alleged witnessing "suspicious activity" at the 4207 Gantz Rd., Grove City, Ohio location, such as numerous patients arriving at the practice with out of state license plates including Michigan, Pennsylvania, New York, Kentucky, and Florida. The complainant also reported witnessing CPR staff interacting with patients in the parking lot and appeared to hand out prescriptions without the patients even entering the building. Finally, the complainant also reportedly witnessed some patients arrive, enter building, and leave all within 5 minutes, which led the complainant to believe GULAM is simply just handing out pain medication prescriptions at CPR.

43.      On October 15, 2020, agents interviewed U.B., who worked at the Grove City CPR office from April 2019 until June 2019. According to U.B., GULAM instructed U.B. to falsify patient records by copying vitals from the previous office visit. U.B. stated GULAM also forced patients to undergo unnecessary injections, which were determined by a patient's insurance rather than the patient's needs. U.B. claimed staff joked that patients with United Health Care insurance always had to undergo more injections. U.B. believed the injections were motivated by money rather than by patient need.

44.      On October 15, 2020, agents interviewed M.H., who formerly worked at CPR in early 2019. M.H. stated she was pressured by GULAM to schedule more injections for patients. M.H claimed the number of injections was driven by the patient's insurance, rather than the needs of the patient. M.H. stated GULAM threatened to withhold patient's pain medication prescriptions if they did not agree to undergo the injection procedures.

11

45. On October 15, 2020, agents interviewed E.B., a former CPR employee who primarily worked with ABIDA at the Columbus location, but also occasionally worked with GULAM at the Grove City office. E.B. stated patients at CPR were forced to undergo unnecessary injections because they made CPR a lot of money. E.B. added patients who refused the injections weren't given their pain medication prescriptions and/or were dismissed from the practice. E.B., who left CPR in November 2019 after receiving a nursing degree, claimed GULAM and ABIDA did not establish actual treatment plans for patients, rather they just prescribed pain medications and conducted injections with no real end goal in sight. E.B. claimed most office visits lasted less than 5 minutes and although CPR conducted urine drug screens (UDS), E.B. did not believe GULAM or ABIDA actually paid attention to the UDS results.

46. On October 22, 2020, agents interviewed A.D., a former employee and patient at CPR. A.D. stated patients were required to submit urine samples for UDS. All UDS were then sent off to the lab for additional confirmation testing regardless of the results of the initial preliminary UDS. According to A.D., patients waited for hours to be seen for less than a 5-minute office visit, where the patient provided a urine sample and received a refill on his/her pain medication. A.D. stated CPR did not even collect patient vitals during the office visit. A.D. estimated GULAM saw 60-70 patients per day. A.D. added GULAM forced patients to undergo repeated unnecessary injections by withholding their pain medications if they refused. A.D. stated GULAM conducted the injections simply to make money and described GULAM as "a money hungry man".

12

47.    On April 23, 2021, agents interviewed D.P., who worked at CPR's Columbus office around March 2020. D.P. reportedly first learned of CPR through D.P.'s federal probation officer, who attends the same mosque as ABIDA. According to D.P., ABIDA reportedly approached D.P.'s probation officer about her willingness to hire someone with a prior felony conviction to work the front desk at CPR. The probation officer then provided D.P. with ABIDA's contact information.

48.    D.P. stated she immediately began noticing red flags at CPR, including ABIDA spending less than 2 minutes with patients and not conducting physical exams or collecting any vitals. D.P. claimed patients received monthly UDS, but ABIDA did not seem to care about the results despite repeated failed screens in the patient charts. D.P. stated during the onset of the pandemic patients just picked up their prescriptions without actually seeing the doctor for an office visit. D.P. claimed patients were forced to undergo injections in order to receive his/her pain medication. D.P. heard ABIDA say, "No injection, no medicine."

49.    D.P. reportedly observed many of ABIDA's regular patients just come to the front desk where ABIDA said, "Everything still the same? OK, here's your script. Make your next appointment." D.P. claimed pain medications were "handed out like candy" at CPR. D.P. said CPR was known as "the dope man" due to the amount of pain medications prescribed by GULAM and ABIDA.

13

50.     On December 7, 2020, agents interviewed D.V., a former CPR patient. At the beginning of the interview, D.V. immediately volunteered CPR was her idea of a "pill mill". D.V. stated she began seeing GULAM at the Wall St. office in December 2019. D.V. stated she barely even spoke with GULAM on the first visit, as he did not take any vitals or perform any type of physical exam. Instead, D.V. provided a urine sample for drug testing on the first visit and returned a week later to receive a prescription. D.V., who had never taken any pain medication prior to seeing GULAM, received a 30-day supply of Oxycodone on the second visit. D.V. denied GULAM even discussed the UDS results or her pain at all. D.V. stated, "He (GULAM) wouldn't spend a minute with you." D.V. added, "He was not thorough at all." D.V. recalled receiving her second Oxycodone prescription from the receptionist without seeing GULAM at all.

51.     D.V. recalled on another visit, she had an appointment scheduled for 9:40am, but she did not leave until 5:00pm as it appeared staff forgot about her in a waiting room. On that visit, she eventually walked out to find GULAM who quickly wrote her a prescription without any discussion about her pain. D.V. was then still asked to provide a UDS before she left.

52.     D.V. reportedly witnessed numerous occasions of other patients also receiving prescriptions from staff without seeing GULAM or ABIDA. On some occasions, D.V. stated she observed a staff member bring prescriptions out to patients in the parking lot without those patients ever even entering the building.

53.     D.V. recalled one instance while she was sitting in the parking lot at CPR when another patient approached her vehicle and asked if she was "here for the wait." D.V. explained the unidentified female (female #1) then reportedly told her that female #1 actually brings another female (female #2) to CPR who receives the pain medication prescription from GULAM or ABIDA. Female #1 then drives female #2 to the pharmacy to fill the prescription and female #1 pays female #2 for her pain pills. D.V. stated she was shocked by the story. D.V. stated she then observed an older black female exit CPR and approach female #1, who said, "Ope! Time for me to go!" D.V. then witnessed the two females drive off together.

54.     D.V. stated she never received any help from GULAM and during several visits she wasn't even seen in an exam room. D.V. believed many patients simply received their prescriptions without seeing the doctor because there was no way GULAM could see everyone who was there waiting. D.V. described CPR as one of "those bad pill mills you only hear about." D.V. claimed she always felt uncomfortable in the waiting room because she didn't "fit in", as most of the patients appeared to be drug addicts. D.V. stopped seeing GULAM in mid-2020 after GULAM wanted to perform knee injections.

55.     On December 9, 2020, agents interviewed L.O., who is a former CPR patient. Before even being questioned, L.O. volunteered that during the onset of the pandemic GULAM was "playing around" by going out to the parking lot with a prescription pad to write prescriptions for pain medications or having other staff take prescriptions out to patients in the parking lot without actually seeing the patients.

56.     L.O. stated she always saw GULAM for her office visits, but witnessed many other patients receive prescriptions from the receptionist without seeing the doctor. Despite always seeing GULAM for her prescription, L.O. claimed GULAM never collected any vitals and never performed any physical exam. L.O. explained she often waited 3-4 hours to be seen for less than 5 minutes. L.O. stated she usually provided a UDS and then GULAM provided her with a refill on her pain medication with a prescription that was already filled out before he entered the room. L.O. added her encounters with GULAM occurred at a small table near the receptionist and claimed there was no privacy whatsoever.

57.     L.O. reportedly witnessed GULAM tell patients on 6 occasions they had failed a UDS, but he still provided them with prescriptions for pain medications and asked them to come back the following week for another UDS. L.O. reportedly overheard GULAM say, "You better be clean next week!"

58.     Upon asking L.O. about fluoroscopy that was billed to Ohio Medicaid for her first visit in December 2019, L.O. denied she ever received any imaging or injections at CPR. According to Ohio Medicaid billing records, CPR billed $203.00 and were paid $43.64 for CPT code 76000 (Fluoroscopy up to 1 Hr Physician) for date of service 12/16/2019 for L.O..

59.     L.O. stated her last visit to CPR occurred in August 2020. L.O. stated she left because GULAM was always pushing her and other patients to undergo biweekly injections, which she knew would not be helpful based on her previous experience. L.O. stated GULAM also lost her MRI imaging results on several occasions and did not seem to care about her health or managing her pain. L.O. believed GULAM was only about the money and not about patient care. L.O. said CPR did not even seem like a real medical practice. L.O. added CPR was just about money and handing out prescriptions.

16

60.     On July 15, 2021, agents conducted surveillance at 4215 Gantz Rd., Grove City, Ohio. During the surveillance operation, at 8:59am, agents observed GULAM arrive at the address driving a dark blue Tesla, matching the 2017 dark blue Tesla registered to Chronic Pain Resources with Ohio plate number HCE8458. After exiting the vehicle, GULAM retrieved a brown cardboard box from the trunk of the vehicle. The box, which had no lid, appeared to contain numerous individual plastic bags inside. Agents then watched as GULAM entered the premises at 4215 Gantz Rd through the white door located immediately to the left of the garage door. At 9:01am, GULAM exited the building and returned to his vehicle without the box. Agents then observed GULAM immediately drive next door to the CPR practice at 4207 Gantz Rd., Grove City, Ohio where he entered the building.

61.     During the investigation, agents also received and reviewed information regarding T.E., a former CPR patient who began seeing ABIDA in November 2015. During her time at CPR, T.E. received prescriptions from GULAM and ABIDA, which were quickly escalated from 60 Percocet 5-325 in November 2015 to 120 Oxycodone HCL less than a year later in October 2016. In addition, while receiving opioid medications from GULAM and ABIDA, T.E. also received monthly prescriptions of 2mg Alprazolam, a benzodiazepine, from another physician.

62.     On March 28, 2018, T.E. received a refill of her 120 Oxydocone HCL 15mg prescription from ABIDA. On April 17, 2018, T.E.'s husband contacted Clinton Township EMS after finding T.E. unconscious on the floor of their apartment after reportedly taking "too much Percocet". EMS arrived moments later and revived T.E. with two doses of Narcan before transporting T.E. to Riverside Hospital where she later checked herself out against medical advice.

17

63.     Despite the April 17, 2018 overdose incident, T.E. returned to CPR and received another 120 count Oxycodone HCL 15 mg prescription from ABIDA on April 25, 2018. T.E. then continued to receive her same monthly opioid prescriptions from ABIDA until her last prescription on September 12, 2018.

64.     On September 13, 2018, at approximately 8:33am, T.E.'s family contacted Columbus Fire/EMS to report finding T.E. lying on the floor unresponsive. Columbus EMS arrived on scene but was unable to resuscitate T.E., who was pronounced dead at 9:03am.

65.     According to a toxicology conducted by the Franklin County Coroner's Office on the same date, Oxycodone was found in T.E.'s blood at "a known toxic to lethal level" while Alprazolam was also "present at a known toxic level." Following an autopsy conducted by the Franklin County Coroner's Office, Dr. John A. Daniels ruled the manner of death as "accident" with the cause of death as "acute intoxication by the combined effects of oxycodone and alprazolam."

66.     On July 29, 2021, agents executed federal search warrants on the business offices of CPR. During the execution of these warrants, agents observed computers on-site, which were utilizing the Practice Fusion program.

67.     In addition, agents interviewed numerous CPR employees during the execution of the search warrants. According to several CPR staff, including CPR office manager K.R., CPR utilizes Practice Fusion to coordinate all patient scheduling at both practice locations.

18

68.     Accordingly, based on the foregoing, there is probable cause to believe that GULAM and ABIDA are issuing prescriptions for controlled substances which are outside the course of usual medical practice and not for a legitimate medical purpose, as well as causing the submission of fraudulent claims to Medicaid and Medicare. Consequently, there is probable cause to believe that violations of 18 U.S.C. § 1035 (False Statements relating to Health Care Matters), 18 U.S.C. § 1347 (Health Care Fraud), and 21 U.S.C. § 841 (Illegal Drug Distribution), have been committed by individuals at CPR, including GULAM and ABIDA.

**BACKGROUND CONCERNING ELECTRONIC HEALTH RECORDS**

69.     In general, an electronic health record (EHR) is a digital version of a patient's paper medical chart, which include, inter alia, prescription information, medical services and tests provided, the medical provider rendering the services, and the billing information. Companies, such as Practice Fusion, provider healthcare providers access to EHR software.

70.     According to Practice Fusion's website, www.practicefusion.com, the company claims it is the largest cloud-based EHR platform in the U.S., supporting approximately 30,000 medical practices. In addition, Practice Fusion, which was founded in 2005, states its customers "utilize the Practice Fusion platform to help coordinate care and develop innovative programs that help improve healthcare outcomes, reduce costs and improve patient experience." Therefore, the computers of Practice Fusion are likely to contain stored electronic health records of CPR. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to determine what services were rendered and who rendered the services.

19

71.     In general, providers like Practice Fusion ask each of their subscribers to provide certain personal identifying information when registering for an account.  This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, e-mail addresses, and, for paying subscribers, a means and source of payment (including any credit or bank account number).  Providers typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account, and other log files that reflect usage of the account.  In addition, providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access CPR's account.

72.     In some cases, account users will communicate directly with a provider about issues relating to their account, such as technical problems, billing inquiries, or complaints from other users.  Providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

73.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Practice Fusion to disclose to the government copies of the records and other information

(including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

74.     Based on the forgoing, I request that the Court issue the proposed search warrant.

75.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

76.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

Ryan Houston
Special Agent
U.S. Department of Health & Human Services
Office of Inspector General
Office of Investigations

Subscribed and sworn to before me on this ____6____ day of August 2021.

HONORABLE CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE

21

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct. I am employed by Practice Fusion, and my official title is _____. I am a custodian of records for Practice Fusion. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of Practice Fusion, and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

     a.     all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

     b.     such records were kept in the ordinary course of a regularly conducted business activity of Practice Fusion; and

     c.     such records were made by Practice Fusion as a regular practice.

     I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____     _____

Date                     Signature

22